The court shall resume its session. Thank you. Okay, we're getting to the last case on the argument calendar today, and that's Pierce v. Jacobsen. To please the court, Paul Rossi for appellants. I'd like to reserve five minutes of my time for rebuttal, please. All right. I'd like to start off by making two points. We believe that this court clearly committed error in not granting appellants motion for summary judgment with respect to the residency ban, because that's simply controlled by this court's precedent in Nader v. Brewer. We think that the case law is sufficiently clear on the residency requirement. I don't want to spend a lot of time on it today unless you have questions on that issue. But we believe that the case law is sufficiently clear that this court should enter a summary judgment in favor of appellants on the residency issue. That's 1327.102.2a. We also believe that the lower court committed reversible error. We are here on cross motions for summary judgment. The lower court appellants in this case created an unequivocal record of a reduction of the pool of circulators, specifically of professional circulators, the best circulators in the nation, do not want to submit to a ban on per-signature compensation because they can simply go to the other jurisdictions that allow per-signature compensation. Unlike in Preet, our record that we established is concrete. It's unequivocal, unlike the testimony that was given in Preet that this court was confronted with. And this court simply said that the lower court didn't abuse its discretion. So this case, with respect to the signature ban, is not Preet. At the outset of this litigation, the preliminary injunction issue isn't in front of this court at this point, but we move for motion for preliminary injunction, fully expecting to get relief because in the affidavits we submitted to the court and on the force of the residency, Nader V. Brewer, with respect to the residency ban, we are expecting to get immediate relief so that all the plaintiffs, all the appellants could immediately jump in, get the signatures, and qualify the citizen voting initiative for the Montana ballot. In that hearing, lower court suggested, well, there are lots of unemployed Montanans that would be happy to circulate these petitions, which sort of set the tone for this entire case, which is this notion that our appellants are required to either A, to use Montanans, which Nader V. Brewer says we don't have to. And then there are testimony in this case, which you'll hear from opposing counsel, I suspect, is that the people in Montana that are established have developed these systems to use volunteers to collect signatures, and they have the people who are willing in Montana to circulate on a per-hourly basis. These organizations have monopolies in Montana, and they're also organizations that our appellants, which are more conservative in nature, would never use anyway, even if they would deign to accept our appellants to circulate their petitions. Can you help me out, counsel, and go through the evidence with regard to the per-signature compensation ban? Can you go through the evidence that establishes that the ban is a barrier to ballot access? You've got the Farrell Declaration, right? But how does that show that a larger number, any sort of larger substantial number of non-resident circulators would be deterred? Well, the record shows that Tim Mooney and Silver Bullet was the firm that they were contracting for to circulate petitions in Montana. They used the best petition circulators in the country, and they were number one banned from coming in there because of the residency ban. But they also would not come in and submit to the per-signature jurisdiction. So it wasn't just Sherry Farrell. The deposition testimony in this record, the entire record, thousands of pages, are from circulators saying that we will not circulate under a compensation ban where we can't be fairly compensated for producing valid signatures. It's not just Sherry Farrell's. There's deposition testimony, which is part of the record here in Congress. And it's not just from Sherry Farrell. It's from Tim Mooney of Silver Bullet, who was going to be contracted, who would not come into Montana unless the residency ban and the per-signature ban was struck down. And other petition circulators testified in this case that they would not come in because the per-signature ban is unfair to their economic compensation, and they can simply go to other jurisdictions to get compensation. Let me ask you, are the two provisions – you're linking the two provisions in your response to Judge Wynn's question. Do you need to do that? I don't need to do that. First of all, the residency ban is independently unconstitutional. This court has decided that. Now, closing counsel has tried to say, well, there was fraud at the beginning of the millennium, and therefore that's why we have to have this residency ban. Well, there was fraud by Nader two years before he brought the Nader case, and the court understood that fraud exists. The issue isn't does fraud exist. It's how do you protect – As I understood your argument and our case law is that the residency ban just excludes everybody who's not a resident as a potential circulator. Correct. So the residency ban is easier. It's an easier issue we will accept because when you have a residency ban, you exclude except for maybe California. Every state excludes 300 million people from circulating in their state. But the reality also is that Joe Schmoe from Maryland who has never circulated isn't going to come to Montana or to Arizona or to California to circulate. It's the cadre of professional circulators. There's a cadre of a couple thousand professional circulators in this country. All right. Hold on. Just hold on. I know you're excited about this. I am excited. On the per-signature payment, you can't pay on a per-signature basis, is that the only restriction that the statute imposes? In other words, why can't you offer – or could you offer a bonus or could you offer – We don't believe – – a higher rate or other means of encouraging providing greater pay? Well, first of all, providing – the reason circulators and petition firms are so opposed to these bans is because if you pay a higher rate, you have to pay based on the time spent. And what petition firms have – and frankly, what they've just experienced in Florida just this year is that circulators go out and they – when they're being paid by the hour, they don't hustle. They don't get signatures as quickly as possible. They milk the system because – Well, why can't – could you offer a bonus? Bonus is a problem. We don't – these bans are tied to criminal penalties, and there's a worry that if you pay a bonus based on signatures produced, then you're paying per-signature and that there's a threat there that criminal penalties will come into play if you do a bonus. There is – we don't believe there's a workaround on the per-signature ban here. And with respect to PREET, the courts had testimony in front of it – How about for – maybe a bonus for the quality of the signature, that is, you get more signatures that are good or valid, you get a bonus for that. I would like for Montana to go back and rewrite the statute and express that you can do these other things. But right now, it's a blanket ban, and circulators are fearful of coming into the state, and the sponsors are fearful of paying for anything other than hourly basis. That's the problem. This is a blanket ban. For instance, Your Honor, why do they even have a ban on per-signature? Why can't they have a ban on paying for invalid or fraudulent signatures? That would at least be closer tied to the state's interest. Here, they're banning you – they're banning on paying for valid signatures, which have no fraud, which is the only – there's really only state interest at stake here. And by the way, they have not provided any evidence that a per-signature scheme encourages fraud. No attorney general in any case across the state, across the nation, has provided that evidence. And I would also suggest that in Montana, they allow non-residents to circulate, and they allow per-signature payment when it's candidate petitions. Let me ask you this. Has there been any court that has struck down the per-signature ban? Yes. Gessler in Colorado, Independence Institute v. Gessler, which is cited, on our terms in Maine, and the Sixth Circuit in Citizens for Tax-Referred v. Dieters. That case is 518 F. 3rd 375, Sixth Circuit in 2008. And the record we established in this case is identical to the record established in those cases where those courts found that the burden on circulation was severe. And they struck down – essentially knocked down all the arguments my opposing counsel is going to make to you, or has made, and I expect to make in this court of argument, that, well, we have to conduct against fraud. Or that we had fraud when this was in place, and we changed it because of that. Well, just because a law is in place when fraud occurs isn't evidence that the permission to pay per-signature creates the fraud. And I would suggest if there is any evidence that either of these bans encourages fraud, you would have that evidence in Montana now because they certainly allow it for candidate petitions. Legislatures don't like the initial process. I thought there was some evidence in the record regarding the amount of fraud related to the petition gathering, you know, to the signature gathering. That was one instance back in 2000, and Christian can probably correct me. I think it was 2006. That was the only incidence that is in the record of petition fraud in Montana. And then that is the basis for which they changed these laws. But currently, they allow residents and they allow per-signature compensation in Montana for candidate petitions. Legislators want to be able – legislators know that these restrictions make it nearly impossible to get onto the ballot, especially for out-of-state interests that has an issue in front of Montana. But they want these circulators to be able to come in from out-of-state and to be paid per-signature when it's their petitions and when it's their candidates for president trying to get onto the ballot. And because Montana has this dual hypocritical system, if there was any evidence of fraud in residency or currently in residency or in pay per-signature, they would have it readily available in Montana, and they have not produced any of that evidence. And they certainly scoured high and low for any little trip-up by any of the plaintiffs, none of which is evidence that these bans actually are tethered to preventing fraud. But they certainly would have found something somewhere where they produced no evidence that a per-signature compensation encourages fraud just because it was in effect back in 2006 when these incidents happened in Montana isn't evidence that the compensation scheme caused the fraud. And Citizens for Tax Reform v. Dieters very clearly strikes that argument down. Council, I understand your argument about the ban on out-of-state solicitors. But on the other issue, the pay per-signature, really your evidence is, as I understand it, one company, maybe more, but certainly one company who has a circulator preference, basically, for lack of a better term. They prefer to be paid per-signature. How is that a restriction on voices participating in democracy that is protected by the First Amendment? Because it reduces the… Isn't it just circulator preference here? No. Well, first of all, a sponsor has to be able to hire circulators. If circulators say no, then they can't get the circulators, and that is a reduction in the pool of circulators available to sponsor. We're protecting the sponsors right here to be able to hire circulators. And when the circulators say no, I'm not going to submit to an hourly compensation scheme, and they can't hire them, that's a reduction in the pool of circulators, and they cannot circulate, and they cannot get signatures. That limits the number of voters that the sponsors can reach. It makes it less likely that they're going to make it onto the ballot, and it also – these hourly compensation schemes create incredible management problems. How do you – they have to literally field an army of managers to make sure that their circulators are actually circulating and not milking the clock. They also can't plan any kind of reasonable budget at the outset and go to their donors and say, it's going to cost X number of dollars because if you can pay per signature, you can say we have to get 20,000 signatures. We have to pay $5 per signature. It's going to cost $100,000. If you get us that money, we can launch the petition drive, and we're going to be successful. Donors don't want to give to a petition drive where they can't look at a reasonable budget and that their money isn't going to go down a raffle. So the per signature ban really impairs the ability of a sponsor to raise funds, field a competent professional petition circulator army, and have any ability to really manage the process and have any reasonable understanding that they're going to actually be able to make it onto the ballot. Again, if they're so worried about fraud, ban paying signatures, invalid signatures, or fraudulent signatures. Don't ban paying by valid signature, which is all we want. I'm getting down. I'd like to reserve my time for rebuttals. All right. Good morning, Your Honors, and may it please the court. Christian Corrigan, Assistant Solicitor General for the State of Montana, on behalf of Defendants Appellees. This court should affirm the judgment of the district court for two reasons. First, the plaintiff's appellants failed to carry their evidentiary burden to show that Montana's fraud prevention measures for ballot initiatives constitute any burden, much less a severe one on their First Amendment rights. And second, even if plaintiffs had shown the law imposes a burden, Montana's law still satisfies both lesser and strict scrutiny. The Montana Constitution confers the unique right to the people to amend the Constitution or enact laws by initiative. And in 2006, three initiatives almost made it onto the ballot after a process that was permeated by fraud and procedural noncompliance perpetrated primarily by nonresident signature gatherers and gatherers paid on a per signature basis. So in 2007, the Montana legislature responded to this widespread fraud by passing SB 96, which requires a person circulating an initiative petition to be a Montana resident who has not paid anything of value based on the number of signatures collected. The district court record aptly demonstrates that the petition industry is rife with fraud, and these measures are necessary to safeguard the integrity of Montana's ballot initiative process. Council, can I ask you a question? Let's separate the residency requirement with the per signature issue. There are, by this residency restriction, hundreds of millions of nonresidents, prospective circulators who would be excluded. Isn't that enough to trigger strict scrutiny? I don't think so, Your Honor. And I think the first thing I would get to is the nature of the evidentiary burden in these First Amendment cases. And as the plaintiff appellant's briefing points out, and we agree, First Amendment ballot access cases are necessarily fact intensive, and it's incorrect that they can simply skip the step of proving the existence of a burden at all. That's part of their prima facie case. And even if similar laws have been adjudicated in this jurisdiction or in other jurisdictions, they always bear the burden of proof. As the court said in Arizona Green Party, quoting the Brewer decision, in challenging ballot access regulations, parties must articulate the nature of the burden, which should be measured by whether, in light of the entire statutory scheme, reasonably diligent parties can gain a place on the ballot. I'm not sure that I got the answer to my question. How is it that hundreds of millions of nonresident prospective circulators being excluded not enough to demonstrate a severe burden for purposes of triggering strict scrutiny? Because they have to show two things, Your Honor. First, they actually have to show a burden based on the facts in this particular case, and they have to show reasonable diligence. And we disagree with the plaintiff's characterization that Brewer sets the stage for automatic strict scrutiny. I think that there are differences in Brewer and questions that this court has left open as to whether strict scrutiny automatically applies simply by excluding hundreds of millions of nonresidents. So I would point to the three things relating to the Brewer decision in Nader v. Brewer. First is the procedural aspect. In that case, candidate Nader actually made it onto the ballot under the Arizona law at issue and had his signatures challenged because of the residency requirement. So it was only after he had to be removed from the ballot that he brought his case to the district court. And so that procedurally is much different than these other cases that I'll talk about in a second where a plaintiff has to show reasonable diligence to get on the ballot and prove that there's some type of burden. In candidate Nader's case, it was obviously a burden to him getting on the ballot because it disqualified him from it. The second thing I would point out is in Nader v. Brewer, that's a candidate petition case. And I think that at times courts have looked to the difference between candidate petitions and initiative petitions to find a difference. And I think it's a slightly different consideration and a slightly different analysis. The court in Brewer said that it put a burden on candidate Nader and his out-of-state supporters. But there's no out-of-state candidate here whose rights you can burden. We're talking about an initiative process that belongs to the people of Montana that's serving an essentially legislative function. And I think as this court recognized in Norris, the special right of initiative, which is a legislative function, allows the state to do certain things, such as limiting initiative petitions to only electors rather than, say, corporations. And I'd also point to the so-called consensus that the plaintiff appellants allege exists following Brewer. And I think it actually undercuts the argument that strict scrutiny automatically applies. A reminder that the Brewer case was in 2008. Well, there's a case from 2011 from the District of Idaho cited by the plaintiffs, the Diane v. Usursa case, with a residency requirement where the court didn't automatically apply strict scrutiny. In fact, the district court concluded, in short, the record sufficiently demonstrates that the residency requirement of the Idaho Code as applied to efforts to obtain signatures for independent presidential nominating petitions creates a severe restriction on speech, thus requiring strict scrutiny. So one would think that if Brewer stood for the broad proposition that the plaintiff appellants say it does, that that district court in Idaho would not have had to do an evaluation of the record. I'd also point to the We the People PAC v. Bellows case from 2021 in the District of Maine. This is a case that actually involves some of these same plaintiffs challenging Maine's residency requirement. And that district court discussed the so-called consensus. And the court said that when discussing the consensus, these cases demonstrate that the constitutional analysis here is fact-intensive. And that court considered the actual evidence of the burden. And said the record shows that there are out-of-state professional petition gatherers, such as the plaintiffs, who are skilled at efficiently collecting signatures and ensuring the signatures are valid. And the court also looked to the reasonable diligence that those particular plaintiffs in Maine had tried to recruit resident voters but were unable to. So I think that speaks to both the nature of their evidentiary burden having to prove it, and then second, exercising reasonable diligence. Counsel, if the residency requirement is subject to strict scrutiny, wouldn't it be relatively easy to more narrowly tailor your concerns about fraud simply by perhaps requiring registration of the signature gatherers or maybe even submit to a minimal background check to make sure they weren't fraudsters from other states? I mean, wouldn't it be relatively easy to do that rather than banning your 300 million-plus people from participating? I don't think so, Your Honor. And I would note that in the Brewer decision discussing the residency requirement, the Brewer court did say that the state of Arizona did not contend its history of fraud was related to non-circulators, a history that might justify regulating non-residents differently. But I think there are two points related to your question as to why submitting to jurisdiction is not the cure-all that the plaintiff appellants think it is. One is timing, and second is the nature of petition gatherers. So starting with timing, even if someone submits to jurisdiction, you still actually have to find them and serve them. Whether they're a resident of California or Florida, you actually have to locate them. And that's obviously always going to take more time to find an individual like that than finding a Montana resident. And as the state's put forward, sometimes these ballot initiatives are often challenged on tight timeframes because under Montana law, you can't challenge the sufficiency of a ballot initiative after the actual initiative goes after it's been voted on. And then the interrelated is the nature of the petition gatherers themselves. The state has provided ample evidence that the industry is rife with fraud, and admission by plaintiffs themselves, and that in this industry, people are nomadic and travel from state to state working on various projects. In fact, many of these individuals work from state to state and would not be at the same address or not be subject to service at their home address in whatever state they're a resident. I think Plaintiff's Counsel alluded to that, discussing the nature of these professional petition circulators. And I'd also add that the fraudulent nature of some of what's gone on in the past shows that any type of measure is going to still be tested. I'd point to the situation in the Oklahoma Supreme Court case that was the subject of some of the briefing. But in that case, where Oklahoma actually had a residency requirement, there were cases of circulators that were actually obtaining fake false Oklahoma identification to meet the residency requirement. So any requirement, I think, is going to be subject to some type of fraud. And the question is, what best prepares the state to deal with the fraud under a time frame? And I think given the fact that the state has to find these people, serve them, then one, verify they're a real person, then find them and serve them, and then go through the process of challenging signatures, shows why this is narrowly tailored to address the fraud. And I would add, again, that the Montana Supreme Court's findings in the 2006 case were specifically related to out-of-state signature gatherers and petition circulators paid on a per-signature basis. Let me ask you a question about that. Is there a record that demonstrates what percentage of the fraud was attributable to an out-of-state resident versus a pay-per-signature scheme? Yes, there is, Your Honor. And in that case, there were 43 out-of-state signatures, signature petition circulators, and 94% of the spending on that went to out-of-state circulators. And those out-of-state circulators qualified over half the signatures for the ballot. And all 43 of those out-of-state signature gatherers provided a false address and false contact information during that process. And some of them, the records were complete with them employing deceitful bait-and-switch tactics where they would approach a resident and tell them about one of the three petitions and then ask them to sign for the other two, telling them that it was simply a carbon copy of the first one. And, again, the record was confirmed by individuals who were involved in the process as well as the statistics of how many signatures made it on the ballot. So I think particularly in the 2006 case, Montana directly responded to the two issues that caused the most harm to the state there. What I would point out, Your Honor, as it relates to the standard of review and to how this court should weigh the evidence, I think if this court concludes that there is some type of basic evidentiary burden that the plaintiffs have to meet as the state here contends and it's not automatically subject to strict scrutiny, it's important to note that the district court's evaluations of the allegations both on the residency requirement as well as the paper signature ban are questions of historical fact that this court reviews for clear error. And that was exactly the case in Preet. As this court said, whether or not an alleged burden exists at all is a historical question of fact. And I think, similar to Preet, the record in this case shows that the plaintiffs offered merely conclusory allegations and speculation as to what burdens there might be. And I'll switch over, as far as the record concerns, to Preet v. Bradbury. But I think that this, to the record in Preet, but I think it speaks to both claims. As it relates to the per-signature compensation ban, the plaintiff appellants claim the record is similar to Preet. And I actually somewhat agree with that because the record that was produced in Preet, the court found the allegations as unsupported speculation. Similar to this case, the plaintiffs only had affidavits from an out-of-state firm or people who said they simply wouldn't work in the state of Oregon. And that's very similar to what we have from Plaintiff Farrell as well as the testimony from Paul Moody. And what the court in Preet was looking at to back up those types of allegations were people with real experience in Montana to understand the nature of the burden. And so I think, as it relates to both, this court looks at the district court's factual allegations under the clear error, or review of the factual allegations under the clear error standard. And it's pretty clear that what the plaintiffs would like this court to do is re-weigh the evidence for the district court. And the district court looked and said that the plaintiffs simply did not— But the difference here, though, as compared to Preet, is that we're now in summary judgment. So in evaluating whether there's a trial issue, the inferences really have to be drawn in favor of the appellants. I think so, Your Honor. And you're saying despite that, that the similarity in the record is still not enough to overcome summary judgment? Yes, Your Honor. And I think I would point out the plaintiffs, the appellants don't seem to identify any, quote, material facts that are in dispute. In fact, I didn't see that in their briefing. And so I think the point is they simply would like the court to re-weigh the evidence as the district court did. And I don't think that's the case. So that's for the existence of the burden. And then, of course, once a burden, the existence of a burden is established,  which, of course, this court reviews de novo. But, again, even under summary judgment, the court found that the testimony was unsupported speculation. They simply didn't do their due diligence when it came to providing the necessary information for the district court to conclude that there were barriers to entry. And I think that's an important point. So would you switch to the paper signature issue for a moment? Yes, Your Honor. So I had asked counsel whether the only thing the restriction bans is just can't pay per signature. So what does that mean for other compensation options? Yes, Your Honor. The state's briefing, I think, makes clear that all other – and I would also like to point out that – so it bans payment per signature. It does not mandate a particular method of compensation as far as hourly, daily, any type of other compensation. It only bans one. And so the state's view is that bonuses for a number of valid signatures being completed at the end of completion would be five. And so it only bans that particular method. And I think what's very important, though, related to the nature of this ban, opposing counsel noted that the Citizens for Tax Reform v. Dieter's case from the Sixth Circuit and says that the record here is identical. But I would respectfully disagree. The court actually looked and said that they looked at the ban in Dieter's on a sliding scale between the sort of total ban in Meyer and the pay per signature ban in Preet. And the court actually looked and said the Ohio case at issue there was more restrictive than what was upheld in Preet because it banned all remuneration to circulators except on a per-time basis. So what was at issue in Preet and what's at issue here is simply a ban on per-signature basis. Counsel, can you pay $10,000 once a circulator has achieved 10,000 signatures? Your Honor, I think so. I think you might be able to do that as long as it's not on an actual per-signature basis. That's more in the nature of a bonus if you reach a particular. Yeah, I think it would be tied to the completion of the project rather than the exact number of signatures. I mean, there are always signatures. For example, if a ballot initiative requires 50,000 signatures, usually a firm will go for 80,000 just in case there might be some that are invalid. But I also think your question leads me to the point that Plaintiff Jacob in this case reached out to a firm in Texas called Advanced Micro-Targeting that specifically told him that they do not pay on the per-signature basis because it increases fraud. And that backs up with the Montana Supreme Court found in the 2006 case. And the state of Montana's expert witness testified the same thing. First, that hourly payment is not a barrier to entry for these types of petitions. That paying per-signature increases fraud. And that there have been successful petitions on the Montana ballot even after this law had been initiated. And I think what's also important is that we have admissions from the plaintiffs in their own depositions that this industry is rife with fraud all over. And there have been examples in the briefing as to some of these plaintiffs who claim to be the gold-standard professionals in this case also being accused of fraud. And the state doesn't take a position anyway on whether they actually obviously committed instances of fraud. But it just shows the nature of this, the nature of these types of ballot initiatives and the individuals that work there that they move from state to state and there are often allegations of fraud. And the signature process can be very contentious. And I think that's why the state's both the paper signature ban and the residency requirement are narrowly tailored. I'd also point out that the other case that the plaintiff appellant's claim on the signature ban is similar to this case with a similar record is the Independence Institute v. Gessler case from the District of Colorado. But again, the record in that case is entirely different. The plaintiffs there supported their case with testimony from Colorado petition industries, entities, Colorado witnesses, testimony from both sides established that the law raised per signature cost and made the process significantly less efficient. In fact, in that case, there was even a witness who testified that before the law was enjoined, he was only able to yield 20,000 signatures. And afterwards, when he retained professional circulators, he got the necessary 110,000. That record is entirely different from what we have in this case. And I think as you look at the number of cases and the different cases cited, the main difference is the factual record and the proving the existence of a burden at all. And so I think that when this court looks to the facts, whether they be the constitutional facts or reviewing under the clear error summary judgment standard, you'll find that the plaintiff simply did not go through the proper motions. From them failing to actually go forward with the initiative and essentially refusing to even try to get a candidate on the ballot, waiting to file a lawsuit and then not even trying to, or sorry, not candidate on the ballot, initiative on the ballot, to their failure to develop a record. That's why this court should affirm the judgment of the district court and rule in favor of the defendant, Apolise. And with that, I thank the court for its time. Thank you, counsel. Please unmute yourself, please. Please unmute yourself. I'm sorry. Let me work backwards first. The Texas firm that alleged that we only pay by per hour because we think that, you know, per signature causes fraud is one of the two firms that has a monopoly in Montana. They're the only other firm other than M plus R that have operations in Montana to circulate petitions. So you have to look at their evidence a little scantily. They don't want per signature to be permitted because it'll allow other circulators to come into the state and to take business from them, which goes directly to the central issue in this case. Per signature restricts the pool of available circulators, which triggers strict scrutiny. And this record that we've established, first of all, I think the court can take notice that, I mean, that other courts have records that show that per signature bans restrict the pool of available circulators. We've replicated that in this case. Circulators have specifically said, circulating firms have specifically said that they will not come in and work under a per signature ban because of all the reasons I stated earlier in my argument. And the fact that, look, other courts have looked at this issue and have ratified that per signature bans reduce the pool of available circulators. And we have that record in this case as well. I don't think you can ignore what was done in Colorado or the Sixth Circuit or in Maine in establishing after Preet came down that there's a more fulsome historical record now that these per signature bans do in fact impair the ability to contract with professional circulators that didn't exist in Preet. I agree with what was in counsel. You have to look at the historical record. Back in 2006, there was not a historical record of litigation on this issue that now exists. And in this case, the depositions and the testimony of circulating firms, of sponsors, of individual circulators show that they will not work for per signature under a per signature compensation ban. And with respect to this idea that we don't, well, we don't restrict how you actually do the compensation except for per signature, the only thing left to compensate is time. Now, whether that's on an hourly basis or a daily basis doesn't really, is a distinction without meaning. The only way to compensate circulators is either by the number of valid signatures they produce or the amount of time they spend out on the street. And when you rely on the amount of time out on the street, that actually increases fraud itself. It also reduces validity of signatures because they're being paid for their time and not valid signatures. They don't have the wherewithal to make sure that the signatures that are being recorded are actually valid. So the paying circulators on a valid per signature basis is the most efficient, as citizens for tax reform versus Dieter say, and it also opens up the pool of available circulators. The very reason M plus R, their expert testimony, M plus R's firm and this Texas firm, the reason they back up this per hour circulation business is because they want to keep a monopoly in Montana. And the one firm has a very strong ideological bent that our guys can't use and wouldn't use even if they would allow them to because they're not going to pay a bunch of money in profit to a firm which supports the other side of the agenda. I understand that you're arguing for strict scrutiny to be applied in both instances, but if the less exacting review applies, did the district court err in its application of less exacting review? Yes, because under less exacting review, the state has to still show that the compensation, the per signature compensation ban or the residence requirement actually causes fraud. They have not produced that evidence here. All they have produced is that we had fraud back in 2006. These laws were in place and therefore we changed them and that's their only evidence. They didn't change it with respect to candidate petitions and they have no evidence of fraud in candidate petitions which allow residents and which allow per signature compensation. Our record is sufficient, is consistent with Gessler, is consistent with Dieter's, is consistent with on our terms and I think the court needs to take a look at all these cases and the historic record which has been established in litigation which has happened since Preet which clearly establishes that these bans, this per signature ban reduces the pool of available circulators. And by the way, we're not required to use Montanans. We have a right under Nader v. Brewer to rely on out-of-state circulators which my clients were going to do until the lower court said we're not going to give you the injunction and they pulled the plug at that point because they knew they couldn't get the signatures and under Meyer v. Grant, we're not required to submit and go through their hoops to prove that we can't get on the ballot before we can bring this constitutional challenge which is part of their argument here. It's like, well, you pulled the plug. You didn't try to get signatures. Therefore, you can't bring this First Amendment challenge. That's completely at odds with what Meyer v. Grant says at page 424 that we're not required to submit to less, more burdensome means to try to get onto the ballot. And by the way, Sherry Farrell. Thank you, counsel. You're actually over time but I think we've caught the argument. The matter is submitted. And we'll be in recess until tomorrow morning. All rise.
judges: PAEZ, NGUYEN, Tunheim